**FEDERAL TRADE COMMISSION**
Plaintiff,

v.

**Keith GILL, et al. Defendants.**

**No. CV–98–1436 LGB (MCX).**

United States District Court,
C.D. California.

July 13, 2001.

John D. Jacobs, Raymond E. McKown, Jennifer Larabee, Federal Trade Com'n, Los Angeles, CA, Gregory W. Staples, AUSA Office of US Atty Civ. Div., Santa Ana, CA, for Federal Trade Com'n.

Keith H. Gill, Keith H. Gill Law Offices, Woodland Hills, CA, Herbert Davis, Herbert Davis Law Offices, Los Angeles, CA, for Keith H. Gill.

Susan I. Montgomery, Gumport Reitman & Montgomery, Los Angeles, CA, for Credit Restoration Corp. of America Inc.

Glenna J. Gill, Calabasas, CA, pro se.

Keith H. Gill, Woodland Hills, CA, pro se.

ORDER HOLDING DEFENDANTS IN CONTEMPT OF NOVEMBER 4, 1999 FINAL ORDER AND ORDERING SANCTIONS

BAIRD, District Judge.

## I. INTRODUCTION

On November 4, 1999, the Court granted summary judgment for Plaintiff, Federal Trade Commission ("FTC") and held that the Defendants, Keith Gill ("Gill") and Richard Murkey ("Murkey"), unlawfully sold credit repair service. The Court's Order prohibited Defendants from engaging in the credit repair business and related activities. Defendants bring the instant ex parte application for an order to show

cause why Defendants should not be held in contempt of the Court's Order.

## II. FACTS AND PROCEDURAL HISTORY

### A. THE PARTIES

Defendant Gill is a licensed attorney who did business as a sole practitioner at the Law Offices of Keith Gill. *See* Summ. J. Order at 2. In addition to a general law practice, Gill had offered credit repair services to consumers since 1995. *See id.* Defendant Murkey is a retired attorney. *See id.* Since 1995, in conjunction with Gill's office, Murkey had offered credit repair services to consumers. *See id.*

While this litigation was pending, Murkey began operating the Credit Restoration Corporation of America, Inc. ("CRCA"). *See* Stahl Decl., Ex. 18 at 248, 252. The CRCA is a nonprofit organization whose articles of incorporation attest to the fact that its "specific purposes, without limitation, is to counsel and educate consumers on legitimate ways to obtain and maintain good credit." *See* Stahl Decl., Ex. 20. Beginning in March or April 1999, new clients signed credit repair contracts with CRCA rather than with Gill. *See* Stahl Decl., Ex. 18 at 254, 254B, 252, 255; Summ. J. Order at 36. The CRCA also began servicing Gill's customers. *See id.* Murkey founded CRCA and exercises primary authority over the company. *See* Stahl Decl., Ex. 18 at 248–51, 257, 263, 268.

### B. Procedural History

On March 2, 1998, Plaintiff filed its Complaint against Defendants. The Complaint alleged violations of the Credit Repair Organization Act ("CRO Act") and Section 5 of the Federal Trade Commission Act ("FTC Act"). In particular, the Complaint alleged that Defendants were charging and receiving payment for credit repair service before such service was performed. Also, the Defendants were accused of violating the CRO Act and the FTC Act by making misrepresentations to induce customers to purchase their services, including promises to improve credit reports by permanently and lawfully removing negative information even where such information was accurate and not obsolete.

Plaintiff sought a temporary restraining order and preliminary injunction. The parties stipulated to a preliminary injunction against Defendants on April 21, 1998. Murkey thereafter violated the preliminary injunction by misrepresenting information to credit bureaus regarding his clients' credit reports and attempting to collect payment from previous customers through the CRCA. *See* Summ. J. Order at 20, n. 13, 21.

On November 3, 1999, the Court granted summary judgment in favor of Plaintiff.[1] In its Order, the Court found that Defendants had violated the CRO Act by making misrepresentations and by accepting payment before service had been rendered. *See* Summ. J. Order at 15–28, 31. Additionally, the Court ruled that Defendants had violated the FTC Act by making misrepresentations that were likely to mislead consumers. *See id.* at 33.

Both Defendants were served with the Summary Judgment Order. Proofs of service show that Murkey was served with the Summary Judgment Order on November 10, 1999 and that Gill signed a return receipt for the Order that was sent to him

---

1. The Court entered two amended judgments on November 5, 1999 and November 30, 1999. The amended judgments did not substantively alter the judgment entered on November 3, 1999.

by certified mail. The Court also sent the Order to all parties on November 4, 1999.

Both Defendants have appealed the Court's Order to the Ninth Circuit. Neither Defendant has obtained a stay of the Court's Order during the pendency of the appeal.

### C. Injunctive Provisions of the Summary Judgment Order

The Court's Summary Judgement Order included a monetary judgment and extensive injunctive provisions. The injunctive provisions are central to the instant application.

### 1. Ban on Credit Repair

The Court banned Defendants from the credit repair business as follows:

> Defendants Gill and Murkey, individually and doing business as any other entity, and their agents, servants, employees, attorneys, and all persons or entities directly or indirectly under their control, and those in active concert or participation with them who receive actual notice of the Order by personal service or otherwise, whether acting directly or through any business entity or other device, are hereby permanently restrained and enjoined from participating in the advertising, promoting, offering for sale, sale, performance, or distribution of any credit repair service, including but not limited to sitting on the board of directors of any credit repair organization, including any non-profit organization or any other organization that performs credit repair service.

Summ. J. Order at 39–40.

### 2. Prohibition on Specified Representations

The Court barred Defendants from making specific representations to consumers. The Court specified:

> Defendants Gill and Murkey, individually and doing business as any other entity, and their agents, servants, employees, attorneys ... are hereby permanently restrained and enjoined from:

1. Misrepresenting any fact material to a consumer's decision to purchase any credit repair product or service from either Defendant;

2. Representing that either Defendant can substantially improve most consumers' credit reports or profiles by effectuating the permanent lawful removal of bankruptcies, liens, judgments, charge-offs, late payments, foreclosures, repossessions, and other negative information from consumers' credit reports where such information is accurate and not obsolete;

3. Representing that either Defendant will substantially improve any consumer's credit report or profile by effectuating the permanent lawful removal of bankruptcies, liens, judgments, charge-offs, late payments, foreclosures, repossessions, or other negative information from the consumer's credit report where such information is accurate and not obsolete;

4. Inducing, encouraging, or requesting, or assisting or advising any consumer to induce, encourage, or request, any creditor to report false or misleading information, with respect to any consumer's credit worthiness, credit standing, or credit capacity, to a credit reporting agency;

5. Violating the Credit Repair Organization Act, 15 U.S.C., §§ 1679 to 1679j, as presently enacted or as it may hereinafter be amended, including:

a. Violating 15 U.S.C. § 1679b(a)(1) by making any untrue or misleading statement, or counseling or advising any consumer to make any untrue or misleading statement, with respect to any consumer's credit worthiness, credit standing, or credit capacity to any consumer reporting agency as defined in 15 U.S.C. § 1681f or to any person who has extended credit to the consumer or to whom the consumer has applied or is applying for an extension of credit; or

b. Violating 15 U.S.C. § 1679b(a)(2) by making or using any untrue or misleading statement, or counseling or advising any consumer to make any untrue or misleading statement, the intended effect of which is to alter the consumer's identification to prevent the display of the consumer's credit record, history, or rating for the purpose of concealing adverse information that is accurate and not obsolete.

*Id.* at 40–42.

### 3. Prohibition on Demanding Payment and the Customer Notification Requirement

The Court included a requirement that Defendants rescind their preexisting contracts, return their consumers' payments, and provide consumers with notification of rescission. The Court held:

Defendants Gill and Murkey are hereby permanently restrained and enjoined from:

1. Failing to return within ten days of receipt any payment either Defendant receives for any credit repair service pursuant to any contract or agreement that was entered into prior to March 4, 1998, and to include with each such returned payment a notice to the client stating that as a result of a court order the contracts are rescinded and no further payments are due;

2. Demanding payment or enforcing or threatening to enforce any contract or agreement for the performance of credit repair service entered into prior to March 4, 1998; or

3. Failing to mail notices within ten days after the date this Order is entered, to all credit repair clients, if any, who have payments that are due or may become due on contracts for the performance of credit repair service signed prior to March 4, 1998, stating that as a result of a court order the contracts are rescinded and no further payments are due.

*Id.* at 42–43.

### 4. Compliance Report Requirement

Lastly, the Court included numerous monitoring provisions which included the requirement that each Defendant provide a compliance report to the FTC. The compliance report was to include a statement of the manner in which each Defendant had complied with the Court's Order as of the date of the report. *See id.* at 46–49.

### D. The Ex Parte Application

On May 14, 2001, the Plaintiff filed an ex parte Application for an order to show cause ("OSC") why Defendants should not be held in contempt of Nov. 4, 1999 Final Order and temporary relief including asset freeze, appointment of temporary receiver, and order authorizing immediate access and expedited discovery. On May 14, 2001, the Court granted the Plaintiff's ex parte application to seal the file until the close of the third court day following issuance of the OSC. On the same day, the Court also granted the Plaintiff's ex parte application to waive the requirement of

advance notice to Defendants of Plaintiff's ex parte application for an OSC and temporary relief.

On June 5, 2001, the Court granted Plaintiff's ex parte application for OSC why Defendants should not be held in contempt of Nov. 4, 1999 Final Order and temporary relief including asset freeze, appointment of temporary receiver, and order authorizing immediate access and expedited discovery. The Court also issued an order temporarily freezing assets of Murkey and CRCA, appointing a temporary receiver over CRCA, authorizing immediate access to CRCA and expedited discovery. The Court held a hearing on June 7, 2001 regarding the preliminary relief granted and ordered further briefing on the OSC regarding contempt.

#### E. Hearing on OSC Re: Contempt

On June 25, 2001, the Court held a hearing on the OSC regarding contempt. Counsel for Plaintiff was present. Also, counsel for CRCA was present. Richard Murkey and Keith Gill were present in pro per.

At the hearing, the Plaintiff withdrew the declaration of John Jacobs, which was filed in support of the ex parte application for temporary relief. Therefore, the Court has not considered the Declaration of John Jacobs and accompanying exhibits in deciding the OSC regarding contempt.

The Court admitted previously filed declarations and heard testimony from the following witnesses: Bret Smart, Adrian Stern, Amy Goldman, Steve Wang, Richard Murkey Jr., Sarah Hardy, Richard Murkey, Keith Nagayama, Keith Gill, Susan Montgomery. All other declarants' previously filed declarations were admitted and the opposing parties waived their right to cross examination.

The Court heard testimony from the aforementioned witnesses, observed their demeanor, and made judgments as to their credibility. The Court has considered all the foregoing, together with all the papers filed in the matter in reaching its findings set out below.

#### F. Defendants' Post–Order Conduct

Defendant Murkey has continued to conduct the credit repair business in violation of the Court's Order. Defendants Murkey and Gill have failed to comply with the monitoring provisions of the Court's Order.

#### 1. Advertising, promoting and offering to sell credit repair service

#### a. Infomercials

Murkey has continued to air paid, program-length advertisements ("infomercials") for CRCA on the Cable Radio Network ("CRN"). Murkey advertised his credit repair service on CRN prior to the Court's Order and resumed advertising on CRN in April 2000. *See* Ståhl Decl., Ex. 18 at 266. Murkey ran ten two-hour infomercials for CRCA on a weekly basis through June 2000. *See* Smart Decl., Ex. 2 at 12–14, 39; Stahl Decl., Ex. 16. The infomercials resumed recently in March 2001. *See* Stahl Decl. ¶ 2. The recent infomercials featured Murkey and commercials specifically advertising the CRCA. *See* Stahl Decl., Ex. 13 at 142, Ex. 14 at 196; Smart Decl., Ex. 2 at 10–12 ("The Program you're about to hear is 'Turn Your Life Around,' hosted by credit report expert and former lawyer, Rick Murkey" and "Rick Murkey is still part of the company. He's the boss."); Smart Decl., Ex. 2 at 27–28 (commercial for CRCA); Stahl Decl., Ex. 13 at 152–53 (same). The commercials advertise CRCA's telephone number and encourage consumers to call to improve their credit reports. *See* Smart

Decl., Ex. 2 at 27–28 (commercial for CRCA); Stahl Decl., Ex. 13 at 152–53, 164, 182 (same). In general, the infomercials solicit customers for CRCA's services. *See* Stahl Decl. ¶ 7.

During expedited discovery, Plaintiff was able to confirm that CRCA has regularly advertised on CRN. *See* Suppl. Decl. of Ann Stahl in Supp. of Pl.'s Applic. for Contempt Against Keith Gill, Richard Murkey, and CRCA ("Suppl. Stahl Decl.") ¶¶ 16, 26–31. For instance, CRCA's check register for 2001 reflects that CRCA paid nine checks to CRN, some of them expressly for "Radio Shows." *See id.* at ¶ 16, Ex. 30. Canceled checks confirm these payments. *See id.* at ¶ 14, Exs. 28–29. Additionally, An FTC investigator spoke with a CRN representative who confirmed that Murkey and CRCA sponsored a weekly broadcast on CRN which featured Murkey and other CRCA employees. *See id.* at ¶ 31.

### b. Newspaper Ads

The CRCA advertises its services in three weekly newspapers in the San Fernando Valley. *See* Smart Decl., Ex. 6. The ads list typical credit problems and promise "Positive Results in Only 2–3 Months." *Id.* The ads also provide CRCA's phone number, which coincides with the number Murkey provided on the title page of court documents filed by him in this lawsuit and the number provided in the infomercials. *See id.;* Smart Decl., ex. 2 at 25; Murkey's Answer to Compl. filed on Mar. 10, 1998.

### c. Actual Sales of Credit Repair Service

Evidence obtained by Plaintiff from CRCA's premises confirms that Murkey and CRCA have continued to sell credit repair service. Plaintiff found numerous three-ring binders labeled "New Clients" and organized by months. *See* Suppl.

Decl. of Ann Stahl Re:New Clients in Supp. of Pl.'s Applic. for Contempt Sanctions ("Stahl Decl. Re: New Clients") at ¶ 5, Ex. 22. The evidence shows that there were binders for each month since November 1999 when the Court Summary Judgment Order was entered. *See id.* Within each binder is a list of consumer names and corresponding copies of invoices that show those consumers had become new clients during the month designated on the binder. *See id.* The content within these binders was also recorded in hard files stored in file cabinets, which included contracts with clients and copies of invoices. *See id.* at ¶ 6, Ex. 23. The hard files confirm that the lists of clients contained in the "New Client" binders represented the clients with whom CRCA had entered into credit repair contracts. *See id.,* compare Exs. 22, 23. The total number of clients listed in the binders between December 1999 and April 2001 is 626. *See id.* at ¶ 5, Ex. 22, pgs. 8–9, 11–12, 194–95, 345–46, 484–85, 685–87, 765, 849, 889, 972, 1058, 1110, 1113, 1250, 1283, 1329, 1354, 1413.

Furthermore, the Receiver's accountant has examined contracts and other documents found in client files and determined that CRCA was in the business of offering credit repair services to consumers and that its revenues were earned solely from consumers who purchased credit repair services from CRCA. *See* Stern Decl. at ¶¶ 25–27, 32. Deposits to CRCA's bank accounts reflect that the amount of CRCA's gross receipts between January 1, 2000 and November 30, 2000 totals $489,394.84, exclusive of April 2000 deposits. *See* Suppl. Stahl Decl. at ¶¶ 13–15, Exs. 27–29.

### 2. Representations

Murkey continues to represent, through the CRCA, that he can lawfully and per-

manently remove accurate, nonobsolete information from credit reports.

The message conveyed by the infomercials is that the CRCA can and will improve anyone's credit report by removing all the negative information lawfully and permanently. For instance, in the April 1, 2000 infomercial, the CRCA representative claims, "CRCA is one of the only firms that has actually proven that they can handle things legally and get these things taken care of." *See* Smart Decl., Ex. 2 at 17. The infomercials also promise that the CRCA will remove accurate information and that it will guarantee that the information remains deleted from credit report. *See* Stahl Decl., Ex. 19. Plaintiff's investigative calls show that consumers who call the CRCA in response to the infomercials and ads receive the same solicitation and representations. *See* Smart Decl. ¶¶ 7–8, Exs. 3, 7.

During expedited discovery, Plaintiff obtained evidence confirming that Murkey and CRCA are continuing to represent that they can legally and permanently remove all negative items from credit reports. *See* Suppl. Stahl Decl. ¶ 32, Exs. 39, 45, 47. Booklets found in Murkey's office contain statements prohibited by the Court's Summary Judgment Order, including that CRCA "can *legally improve anyone's credit report*" and "[t]here are *many legal ways* to try to permanently improve and/or permanently *remove any type* of negative item ... *even when* the negative accounts are still *unpaid ....*" *Id.; see also* Ex. 39, pgs. 404–07(emphasis in original).

### 3. Payment from Customers and Failure to Issue Notices and to File Compliance Reports

Murkey has continued to demand payment from consumers of the CRCA who signed up for credit repair service prior to March 1998. *See* Consumer Decls. in Supp. of OCS: Frye Decl. ¶ 5, Ex. 4; Wachuku Decl. ¶¶ 7–12, Exs. 4–9. Evidence from CRCA offices and clients' files shows that invoices demanding additional payment were sent to clients who entered into contracts prior to March 4, 1998. *See* Suppl. Stahl Decl. at ¶¶ 7–8; Ex. 25, pgs. 26, 51, 89–90, 125, 163.

Murkey and Gill have also failed to mail notices to clients who entered into contracts prior to March 4, 1998. *See* Consumer Decls. in Supp. of OCS: Carlson Decl. ¶ 3; Frye Decl. ¶ 8; Wachuku Decl. ¶¶ 13–14. During the expedited discovery, Plaintiff claims to have found no evidence to suggest that Defendants sent any notifications of rescission. To the contrary, Defendants have continued to bill clients whose contracts were rescinded and debts extinguished by the Court Order. *See* Suppl. Stahl Decl. ¶¶ 7–8, 39, Exs. 25, 48.

According to Plaintiff, Gill provided a compliance report but failed to detail any efforts to mail rescission notices to consumers, despite Plaintiff's specific request that Gill include a description of his efforts to distribute such notices. *See* Gill Decl., Ex. at 6. Plaintiff also claims that Murkey failed to provide a compliance report but there has been no evidence filed in support of this contention. Defendants' exhibit 2, as admitted at the hearing, shows that Murkey sent a compliance report to the FTC on November 18, 1999.[2] *See* Defs.' Ex. 2.

---

**2.** The letter from Murkey to the FTC is dated November 18, 1999 and states in its entirety:
Pursuant to the Court's request please be advised that all the information previously provided to you, regarding my residence, address, and phone numbers remains unchanged.
In addition, as you are aware I have already notified Mr. Gill's clients, who retained credit repair services prior to 3/4/98,

## III. LEGAL STANDARD

District courts have the inherent power to enforce their orders through civil contempt. *See Shillitani v. United States,* 384 U.S. 364, 370, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966). "Absent a stay, 'all orders and judgments of courts must be complied with promptly.'" *Donovan v. Mazzola,* 716 F.2d 1226, 1240 (9th Cir. 1983) quoting *Maness v. Meyers,* 419 U.S. 449, 458, 95 S.Ct. 584, 42 L.Ed.2d 574 (1975).

 In order to establish Defendants' liability for civil contempt, Plaintiff must show by clear and convincing evidence that the Defendants have violated a specific and definite order of the Court. *See Whittaker Corp. v. Execuair Corp.,* 953 F.2d 510, 517 (9th Cir.1992); *FTC v. Affordable Media, LLC,* 179 F.3d 1228, 1239 (9th Cir.1999). "The burden then shifts to the contemnors to demonstrate why they were unable to comply." *FTC,* 179 F.3d at 1239. In a civil contempt proceeding, a defendant's good faith or intent in attempting to comply with the order is immaterial. *See Stone v. City and County of San Francisco,* 968 F.2d 850, 856–57 (9th Cir.1992).

 Sanctions for civil contempt may be imposed to coerce obedience to a court order, or to compensate the party pursuing the contempt action for injuries resulting from the contemptuous behavior, or both. *See United States v. United Mine Workers,* 330 U.S. 258, 303–04, 67 S.Ct. 677, 91 L.Ed. 884. "[R]emedial or compensatory actions [for contempt] are essentially backward looking, seeking to compensate the complainant through the payment of money for damages caused by past acts of obedience." *Latrobe Steel Co.*

*v. United Steelworkers of America,* 545 F.2d 1336, 1344 (3d Cir.1976). Compensatory awards must "be based upon evidence of complainant's actual loss." *Id.* at 304, 67 S.Ct. 677. In determining the proper amount of a coercive sanction, the court should consider the "character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction." *United Mine Workers,* 330 U.S. at 304, 67 S.Ct. 677.

## IV. Analysis

### A. Violation of Court's Order

 In order to establish Defendants' liability for civil contempt, Plaintiff must show by clear and convincing evidence that the Defendants have violated a specific and definite order of the Court. *See Whittaker Corp.,* 953 F.2d at 517. Plaintiff has shown with clear and convincing evidence that Murkey, Gill, and CRCA have violated the Court's Summary Judgement Order.

First, the Court's Summary Judgement Order prohibited Defendants from advertising, promoting, and offering for sale any credit repair service, whether directly or through any business entity. Plaintiff has presented evidence that Murkey has advertised, promoted, and offered for sale credit repair service. Plaintiff's evidence of transcribed infomercials and print advertisements shows that Murkey has engaged in such activity on the radio, on the internet, and in newspapers ads. The evidence supports Murkey's liability for violation of the Court's Order.

Murkey claims that he appeared in radio programs as only a guest and he made no misrepresentations during those appearances. *See* Murkey's Opp'n at 3; Murkey

---

as required under the preliminary injunction, that no more funds are owed unless they choose to sign a new agreement and re-hire us.

At this time I am pursuing interests in real estate as a new business venture. Defs.' Ex. 2.

Decl. ¶ 4. Having reviewed transcripts of such radio programs, the Court finds that Murkey appeared as more than a "guest" on such programs. Rather, the programs advertise and promote credit repair services and Murkey solicits business during his appearances. *See* Stahl Decl., Ex. 13 at 142, Ex. 14 at 196; Smart Decl., Ex. 2 at 10–12 ("The Program you're about to hear is 'Turn Your Life Around,' hosted by credit report expert and former lawyer, Rick Murkey" and "Rick Murkey is still part of the company. He's the boss."); Smart Decl., Ex. 2 at 27–28 (commercial for CRCA); Stahl Decl., Ex. 13 at 152–53 (same). Murkey was enjoined from making such solicitations directly or through any business entity, which would include the CRCA.[3] Thus, the Court finds sufficient evidence to hold Murkey in contempt for violating the ban on credit repair.

Second, the Court's Order also enjoined Defendants from making representations to consumers regarding Defendants' ability to improve credit reports by removing negative, but accurate and nonobsolete, information. Murkey argues that the Order is ambiguous and overbroad and the use of the term "credit repair services" theoretically bars Murkey from discussing credit issued with any consumers. *See* Murkey's Opp'n at 3.

A review of the relevant portion of the Order shows that it is very detailed regarding what sort of representations are prohibited rather than using the term "credit repair services." The Court barred Defendants from making *specific* representations to consumers. The Court specified:

Defendants Gill and Murkey, individually and doing business as any other entity, and their agents, servants, employees, attorneys ... are hereby permanently restrained and enjoined from:

1. Misrepresenting any fact material to a consumer's decision to purchase any credit repair product or service from either Defendant;

2. Representing that either Defendant can substantially improve most consumers' credit reports or profiles by effectuating the permanent lawful removal of bankruptcies, liens, judgments, charge-offs, late payments, foreclosures, repossessions, and other negative information from consumers' credit reports where such information is accurate and not obsolete;

3. Representing that either Defendant will substantially improve any consumer's credit report or profile by effectuating the permanent lawful removal of bankruptcies, liens, judgments, charge-offs, late payments, foreclosures, repossessions, or other negative information from the consumer's credit report where such information is accurate and not obsolete;

4. Inducing, encouraging, or requesting, or assisting or advising any consumer to induce, encourage, or request, any creditor to report false or misleading information, with respect to any consumer's credit worthiness, credit standing, or credit capacity, to a credit reporting agency;

---

**3.** Murkey claims that he does not perform credit repair services and does not sell such services. *See* Murkey Decl. ¶ 4. Murkey also argues that his statements are meant to educate consumers regarding credit and are not misrepresentations. *See id.* at ¶ 7, 10–11. The evidence submitted by Plaintiff shows that Murkey both sells and performs credit repair services. Furthermore, the Court has already found that the sort of representations being made by Murkey are prohibited by the Credit Repair Restoration Act. Thus, the Court does not address Murkey's argument regarding the legality of his statements.

5. Violating the Credit Repair Organization Act, 15 U.S.C., §§ 1679 to 1679j, as presently enacted or as it may hereinafter be amended, including:

 a. Violating 15 U.S.C. § 1679(a)(1) by making any untrue or misleading statement, or counseling or advising any consumer to make any untrue or misleading statement, with respect to any consumer's credit worthiness, credit standing, or credit capacity to any consumer reporting agency as defined in 15 U.S.C. § 1681(f) or to any person who has extended credit to the consumer or to whom the consumer has applied or is applying for an extension of credit; or

 b. Violating 15 U.S.C. § 1679(a)(2) by making or using any untrue or misleading statement, or counseling or advising any consumer to make any untrue or misleading statement, the intended effect of which is to alter the consumer's identification to prevent the display of the consumer's credit record, history, or rating for the purpose of concealing adverse information that is accurate and not obsolete.

Summ. J. Order at 40–42. Plaintiff's evidence illustrates that Murkey has continued to make such representations in infomercials, in newspaper ads, in booklets, and by telemarketing solicitations. Thus, Plaintiff has shown Murkey's liability for contempt by clear and convincing evidence.

Third, the Court barred Defendants from demanding payment from consumers who signed contracts for credit repair service prior to March 4, 1998 and ordered Defendants to mail letters notifying consumers that such contracts were rescinded. The Court's Order also required both Defendants to provide Plaintiff with a compliance report within 180 days.

Plaintiff's consumer declarations, and accompanying exhibits of invoices, show that Murkey has continued to demand payment from consumers who contracted with Murkey prior to March 4, 1998. Although Murkey claims that he complied with the Court's Order pursuant to the terms of the stipulated preliminary injunction, in April and May 1998, Murkey has not submitted any evidence of such fact. Plaintiff's evidence and efforts during expedited discovery show that both Murkey and Gill failed to mail notifications of rescission and have failed to report to Plaintiff on their efforts to comply with this requirement.

Plaintiff claims that Murkey has not provided a compliance report. Murkey has shown that he provided a compliance report by letter immediately after the Court issued its Order. *See* Murkey's Opp'n at 4; Murkey Decl. ¶ 3; Defs.' Ex. 2. However, the letter, dated November 18, 1999, does not satisfy the requirements of the Court's Order which specifically and clearly set forth the required content for such a report:

> [E]ach Defendant shall provide a written report to the Commission, sworn to under penalty of perjury, setting forth in detail the manner and form in which the Defendant has complied and is complying with this Order. This report shall include but not be limited to ... A statement describing the manner in which the Defendant has complied and is complying with this Order;

Summ. J. Order at 42–43, 46. Murkey's letter of November 18, 1999 does not provide the required information. *See* Defs.' Ex. 2. Therefore, the Court finds that Murkey did not provide Plaintiff with a compliance report that complied with the Court's Order and he, thereby, violated the Court's Order.

Gill argues that he substantially complied with the Court's Order by sending a compliance report to the FTC on June 5, 2000 and by relying on Murkey to send rescission notices to clients on Gill's letterhead. *See* Gill Decl., Exs. "Substantial compliance" is a defense to civil contempt, such that a "few technical violations" do not qualify as contemptuous conduct if every reasonable effort has been made to comply. *Go–Video, Inc. v. Motion Picture Ass'n of America,* 10 F.3d 693, 695 (9th Cir.1993). The Court finds that Murkey did not substantially comply with the Court's Order. The Order was detailed in its requirements:

Defendants Gill and Murkey are hereby permanently restrained and enjoined from ... Failing to mail notices within ten days after the date this Order is entered, to all credit repair clients, if any, who have payments that are due or may become due on contracts for the performance of credit repair service signed prior to March 4, 1998, stating that as a result of a court order the contracts are rescinded and no further payments are due.

. . . .

One hundred eighty days after the date of entry of this Order, each Defendant shall provide a written report to the Commission, sworn to under penalty of perjury, setting forth in detail the manner and form in which the Defendant has complied and is complying with this Order. This report shall include but not be limited to... A statement describing the manner in which the Defendant has complied and is complying with this Order;

Summ. J. Order at 42–43, 46. The compliance report sent by Gill fails to detail any efforts made by Gill to mail rescission notices to consumers, despite the Order's specificity and Plaintiff's specific request

thereafter that Gill include a description of his efforts to distribute such notices. *See* Gill Decl. Ex. at 6. The letters allegedly sent by Murkey to Defendants' clients do not substantially comply with the Court's Order. The letter does not state "that as a result of a court order the contracts are rescinded and no further payments are due." Summ. J. Order at 42–43. Instead, the letter states:

Recently, the Federal Trade Commission (FTC) required our offices to revise our contracts with each one of our current clients ... Therefore, I have enclosed a **new retainer agreement** which you should sign ... and **return** to us with **payment** ... if you want us to continue to work on your behalf .... Should you decide **not** to sign this new agreement, **nor** send us a payment then, unfortunately, we will not be able to continue to try to help you improve your credit.

Gill Decl., Ex.(emphasis in original). The letter clearly does not comply with the spirit of the Court's Order. Nor has Gill shown that he made every reasonable effort to comply, considering that he delegated his responsibility to Murkey and must now be held accountable for the deficiencies in the letter sent by Murkey. Therefore, the Defendants' reliance on this letter as their illustration of compliance is misplaced. *See* Murkey's Opp'n at 4.

Gill also claims that Plaintiff has not shown clear and convincing evidence of Gill's contemptuous conduct. Contrary to Gill's argument, the Court finds that Plaintiff has shown by clear and convincing evidence that Gill violated the Court's Order by failing to send rescission notices and by failing to supply Plaintiff with a complete compliance report. Gill's noncompliance consists of more than a "few technical violations." Thus, Plaintiff has

shown that both Murkey and Gill are liable for contempt.

Plaintiff's evidence shows by clear and convincing evidence that Defendants have violated the Court's Order and should be held liable for contempt.

 Federal Rule of Civil Procedure 65(d) explains that injunctions are binding on the parties to the action, as well as "those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise." Fed.R.Civ.P. 65(d). The Ninth Circuit has also held that an injunction is binding on a nonparty which has actual notice and either (1) is the alter ego of, or has an identity of interest with, a party, or (2) aids and abets a party's violation of the order. *See Peterson v. Highland Music, Inc.,* 140 F.3d 1313, 1323–24 (9th Cir.1998). Similarly, while certain nonprofit corporations are exempt from liability for violations of section 5(a)(1) of the FTC Act, the exemption does not apply to sham corporations that are the mere alter ego of the contemnor. *See Community Blood Bank v. FTC,* 405 F.2d 1011, 1019 (8th Cir.1969); *Ohio Christian College,* 80 F.T.C. 815, 847–48 (1972). Moreover, Plaintiff is not seeking to enforce Section 5 of the FTC, but rather an Order of the Court that directly references nonprofit organizations in its prohibition. The Court's Order specifically enjoined "those in active concert or participation with" Defendants, including "any non-profit organization or any other organization that performs credit repair service." Summ. J. Order at 39–42. Accordingly, although CRCA claims to be a nonprofit organization and is not a De-

fendant in this case, its participation in and facilitation of Murkey's conduct makes it eligible for liability.

CRCA argues that it never had any direct notice of the Court's Order and its nonprofit status exempts it from this contempt proceeding. The Court finds that CRCA had notice of the Order and its nonprofit status does not exempt it from a finding of contempt because CRCA is the alter ego of Murkey. Murkey is the owner and founder of CRCA. *See* Stahl Decl., Ex. 18 at 248–51, 257, 263, 268; Hardy Decl., Ex. 2.[4] The evidence shows that CRCA is indistinct from Murkey. *See* Suppl. Stahl Decl. ¶ 17. There is no evidence that an active board of directors exists or that CRCA adheres to corporate formalities. *See* Stern Decl. ¶¶ 16, 17. Murkey controls the finances, handles the banking, and signs all the checks for CRCA, with the exception of payroll checks prepared by an outside firm. *See id.* at ¶ 17. There is evidence that Murkey signed checks to himself as well. *See* Suppl. Stahl. Decl. ¶ 23, Ex. 35, pgs., 322–331; Pl.'s Ex. 111. There is also evidence indicating that Murkey uses income from CRCA for his personal expenses and non-business purposes. Receipts for hotel expenses, restaurants, flowers, and other non-business related items were found in Murkey's CRCA office, inside a box labeled "Taxes," in an envelope labeled "CRCA 3d Quarter." *See* Suppl. Stahl Decl. ¶ 24, Ex. 36, pgs 3334–372. In fact, Murkey kept his receipt for the shipment of his brief to the Ninth Circuit Court of Appeals with other CRCA receipts. *See id.* at 332–33. *See* Lastly, Murkey lives in the CRCA offices. *See id.;* Murkey Decl. ¶ 21. Based on this

---

4. CRCA disputes that Murkey is a director and officer of CRCA and claims that he resigned his positions. *See* CRCA's Opp'n at 3. At the hearing on the contempt, Defendants admitted Exhibit 3 into evidence, which is a letter of resignation from Murkey to all the employees of CRCA, dated November 29, 1999. *See* Defs.' Ex. 3. The Court notes that there is no evidence that suggests that CRCA has a Board of Directors or any corporate officers.

evidence, the Court finds that Murkey had complete control of CRCA, co-mingled personal funds with funds belonging to CRCA, and failed to adhere to the corporate form.[5] Thus, the Court finds that Murkey treated CRCA as his alter ego and that CRCA is not a legitimate nonprofit organization.

Employees of the CRCA have testified that they knew about the case brought by Plaintiff against Murkey but that they had never seen nor had knowledge of the specific prohibitions within the Court's Order. *See* Richard Murkey Jr. Decl. ¶ 15; Isagholian Decl. ¶¶ 2, 3; Hardy Decl. ¶¶ 9, 10. Nevertheless, the Court finds that CRCA had notice of the Court's Order through Murkey. The evidence shows that CRCA is indistinct from Murkey and Murkey used the organization to act in concert with him in his credit repair activities. Thus, Plaintiff has shown CRCA's liability for contempt as a nonparty.

Based on the clear and convincing evidence presented by Plaintiff, the Court finds that Murkey, Gill and CRCA violated the Court's Summary Judgment Order and are, thus, held in contempt.

## B. Final Relief

As final relief, Plaintiff seeks the appointment of a permanent receiver, as well as compensatory and coercive sanctions pursuant to *United States v. United Mine Workers of America*, 330 U.S. 258, 305–05, 67 S.Ct. 677, 91 L.Ed. 884 (1947). Plaintiff asks for compensatory sanctions in the form of restitution or consumer redress. Plaintiff requests that compensatory sanctions equal the amount of CRCA's revenues. Plaintiff argues that in the absence of evidence that any particular client was not injured by the contumacious conduct, the amount of CRCA's revenues totals the amount of consumer injury.

■ In determining the amount of refund needed to redress injury in a fraud action such as this one, "the central issue . . . is whether the seller's misrepresentations tainted the customer's purchasing decisions." *McGregor v. Chierico*, 206 F.3d 1378, 1388 (11th Cir.2000). The Summary Judgment Order was based on Plaintiff's showing that Defendants made misrepresentations and misleading statements. During this OSC, Plaintiff has shown by clear and convincing evidence that Defendants continue to make such misstatements. "Proof of individual reliance by each purchasing customer is not a prerequisite to the provision of equitable relief needed to redress fraud." *Id.* citing *FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 605 (9th Cir.1993). "A presumption of actual reliance arises once the [FTC] has proved that the defendant made material misrepresentations, that they were widely disseminated, and that consumers purchased the defendant's product." *FTC*, 994 F.2d at 605–06.

■ Here, Plaintiff has presented evidence that Defendant Murkey continues to make misrepresentations. Pursuant to

---

5. CRCA insists that there is no proof of co-mingling of funds or that Murkey makes all the decisions for CRCA. *See* CRCA's Opp'n at 3. At the hearing, witnesses Hardy and Murkey Jr. testified that they and Allen Isagholian make the decisions for CRCA, without Murkey Sr. The Court finds the testimony of Murkey Jr. and Hardy regarding the decision-making process within CRCA to lack credibility. Furthermore, CRCA claims that Murkey's use of its premises and his performance of certain services for CRCA does not establish alter ego. *See id.* Based on the substantial evidence presented by Plaintiff, the Court makes the contrary finding. CRCA also argues that its conduct, or credit repair business, is not illegal or wrongful. This issue is not before the Court as it was decided in the Summary Judgment Order.

*McGregor,* the evidence creates a presumption that Defendant's and CRCA's clients relied on those misrepresentations when contracting with and paying for credit repair service. "Given this presumption, the FTC need not prove subjective reliance by each customer, as '[i]t would be virtually impossible for the FTC to offer such proof and to require it would thwart and frustrate the public purposes of FTC action.'" *McGregor,* 206 F.3d at 1388 quoting *FTC v. Security Rare Coin & Bullion Corp.,* 931 F.2d 1312, 1316 (8th Cir.1991). Murkey and CRCA have not presented evidence to rebut the presumption. Therefore, the Court grants Plaintiff's request for compensatory sanctions. The Court orders Murkey and CRCA to rescind all contracts with consumers who have entered contracts with or paid money to Murkey or CRCA for credit repair service after Murkey was served with the Court's Summary Judgment Order. The Court also orders Murkey and CRCA to refund all money received after the date of the Order from consumers whom they were ordered to notify regarding rescission.

Second, Plaintiff requests coercive sanctions in the form of contingent fines against Gill, CRCA, and Murkey. Plaintiff proposes that Defendants Murkey and Gill pay from $1,000 to $5,000.00 for each day that they violate certain injunctive provisions of the Court's Order. The amount differs depending on the violation.

In determining the proper amount of a coercive sanction, the Court should consider the "character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction." *United Mine Workers,* 330 U.S. at 304, 67 S.Ct. 677. In designing an order to coerce compliance, the Court must apply the sanction in a manner that gives the contemnors the opportunity to purge themselves of the contempt by complying with the Court's order. *See International Union, UMWA v. Bagwell,* 512 U.S. 821, 828, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994).

The Court finds that consumers will suffer injury if Defendant continues to make deceptive representations and to receive payment for activities that have been found in violation of the Court's Order. The magnitude of harm posed to the general public by Defendant's continued operation of a fraudulent credit repair business is self-evident. The public has a strong interest in the eradication of fraudulent credit repair businesses. The Court finds that the suggested amounts of contingent fines will serve as effective incentives for Murkey, Gill, and the CRCA to comply with the Court's Orders. Furthermore, the contingent nature of the fine allows contemnors the opportunity to purge themselves of the contempt by complying with the Court's order. *See International Union, UMWA,* 512 U.S. at 828, 114 S.Ct. 2552.

Third, Plaintiff seeks the appointment of a permanent receiver over CRCA who would have the authority to wind down and terminate the corporation. Since Defendants and CRCA have failed to show that CRCA engages in any nonprohibited legitimate business practices, the Court grants Plaintiff's request for a permanent receiver. The Court authorizes the permanent receiver to take any action necessary for the termination of the corporation and for the provision of rescission notices and restitution to CRCA clients.

## VI. CONCLUSION

For the foregoing reasons, the Court HOLDS Murkey, Gill, and CRCA in civil contempt. The Court hereby adopts and incorporates Plaintiff's proposed order with modifications:

Based on clear and convincing evidence, the Court makes the following findings:

1. Murkey was served with the Court's Summary Judgement Order of November 4, 1999 ("Final Order") by no later than November 10, 1999. Gill was served with the Final Order by no later tan December 24, 1999.

2. CRCA is indistinct from Murkey. Murkey has exercised complete control over CRCA. Murkey has treated the assets of CRCA as his own. CRCA has failed to adhere to most standard formalities typically followed by legitimate non-profit organizations. Murkey has used CRCA to further his own finance and comfort.

3. CRCA was put on notice of the terms of the Final Order no later than November 10, 1999, when Murkey was served with the Final Order.

4. Beginning before entry of the Final Order and continuing thereafter, CRCA has been in the business of selling credit repair service to the public and has derived virtually all of its revenues from the sale of credit repair service.

5. Defendant Richard Murkey ("Murkey") has continuously participated in the advertising, promoting, offering for sale, and sale of credit repair service, directly and through CRCA, after he was served with the Final Order.

6. Murkey has violated the provision in the Final Order that prohibits the defendants, and those in active concert or participation with, from participating in the advertising, promoting, offering for sale, and sale of credit repair service. Murkey is liable for contempt for violating this provision of the Final Order, which is specific and definite.

7. After receiving notice of the Final Order, CRCA participated in, assisted and facilitated Murkey's violation of the prohibition on participating in the advertising, promoting, offering for sale, and sale of credit repair service. CRCA is therefore also liable for contempt for violating this provision of the Final Order.

8. Directly and through CRCA, after being served with the Final Order, Murkey has represented in advertisements, in promotional materials and in direct communications with consumers that he and CRCA can substantially improve most consumers' credit reports or profiles, by effectuating the permanent lawful removal of bankruptcies, liens, judgments, charge-offs, late payments, foreclosures, repossessions, or other negative information from consumers' credit reports where such information is accurate and not obsolete. He has also represented to consumers that he and CRCA will substantially improve the particular consumer's credit report or profile, by effectuating the permanent lawful removal of bankruptcies, liens, judgments, charge-offs, late payments, foreclosures, repossessions, or other negative information from the consumer's credit report where such information was accurate and not obsolete.

9. Murkey is liable for contempt for violating the provisions of the Final Order that prohibit the defendants, and those in active concert or participation with them, from (i) representing that they can substantially improve most consumers' credit reports or profiles, by effectuating the permanent lawful removal of bankruptcies, liens, judgments, charge-offs, late payments, foreclosures, repossessions, or other negative information from consumers' credit reports where such information is accurate and not obsolete, and (ii) representing to any consumer that they can substantially improve the consumer's credit report or profile, by effectuating the permanent lawful removal of bankruptcies, liens, judgments, charge-offs, late pay-

ments, foreclosures, repossessions, or other negative information from the consumer's credit report where such information is accurate and not obsolete, which are specific and definite.

10. CRCA participated in, assisted and facilitated Defendant Murkey's violation of the provisions of the Final Order that prohibit the defendants, and those in active concert or participation with them, from (i) representing that they can substantially improve most consumers' credit reports or profiles, by effectuating the permanent lawful removal of bankruptcies, liens, judgments, charge-offs, late payments, foreclosures, repossessions, or other negative information from consumers' credit reports where such information is accurate and not obsolete, and (ii) representing to any consumer that they can substantially improve the consumer's credit report or profile, by effectuating the permanent lawful removal of bankruptcies, liens, judgments, charge-offs, late payments, foreclosures, repossessions, or other negative information from the consumer's credit report where such information is accurate and not obsolete. CRCA is therefore liable for contempt of these provisions of the Final Order.

11. Murkey's and CRCA's representations that they can substantially improve consumers' credit reports or profiles, by effectuating the permanent lawful removal of bankruptcies, liens, judgments, charge-offs, late payments, foreclosures, repossessions, or other negative information from consumers' credit reports where such information is accurate and not obsolete, are false and misleading. These representations were widespread and of the type that a reasonably prudent person would rely upon.

12. The amount of consumer injury from Murkey's and CRCA's false and misleading representations is the amount of money that consumers paid to Murkey and CRCA following service of the Final Order on Murkey on November 11, 1999.

13. Murkey and Gill failed to send notices, within ten days of entry of the Final Order or at anytime thereafter, to all credit repair clients who had payments that were due or have or will become due on contracts for the performance of credit repair service signed prior to March 4, 1998, stating that as a result of a court order the contracts are rescinded and no further payments are due.

14. Murkey and Gill have violated the provision of the Final Order that directed the defendants to send notices, within ten days after entry of the Final Order, to all credit repair clients who had payments that were due or would thereafter become due on contracts for the performance of credit repair service signed prior to March 4, 1998, stating that as a result of a court order the contracts are rescinded and no further payments are due. Murkey and Gill are liable for contempt for violating this provision of the Order, which is specific and definite.

15. After the entry of the Final Order, Murkey has demanded payment on or threatened to enforce contracts or agreements for the performance of credit repair service entered into prior to March 4, 1998.

16. Murkey has violated the provision of the Final Order that prohibited the defendants from demanding payment or enforcing or threatening to enforce any contract or agreement for the performance of credit repair service entered into prior to March 4, 1998. Murkey is liable for contempt for violating this provision of the Final Order, which is specific and definite.

17. Murkey failed to provide the FTC, one hundred eighty days after the date of entry of the Final Order or at anytime thereafter, with a written report, sworn to

under penalty of perjury, setting forth in detail the manner and form in which he had complied with and was complying with the Final Order or a statement of his then current address and telephone number(s), his then current employment, business addresses and telephone numbers, a description of the business activities of each such employer, and his title and responsibilities for each employer.

18. Murkey has violated the provision of the Final Order that directed Murkey, one hundred eighty days after the date of entry of the Final Order, to provide a written report to the Commission, sworn to under penalty of perjury, setting forth in detail the manner and form in which he had complied with and was complying with the Final Order or a statement of his then current address and telephone number(s), his then current employment, business addresses and telephone numbers, a description of the business activities of each such employer, and his title and responsibilities for each employer. Murkey is liable for contempt for violating this provision of the Final Order, which is specific and definite.

19. The Court finds Murkey, Gill and CRCA in civil contempt of the Final Order and deems it necessary to issue this Order to coerce compliance with the Final Order and to compensate for injuries resulting from defendants' contumacious conduct.

20. This action and the relief awarded herein are in addition to, and not in lieu of, other remedies as may be provided by law, including both civil and criminal remedies.

21. Entry of this Order is in the public interest.

## ORDER

### I.

### Sanctions for Violating Prohibition on Engaging in Credit Repair

IT IS THEREFORE ORDERED that Defendant Murkey shall be required to pay to the United States Treasury a fine in the amount of $5,000 per day for each day after entry of this Order in which he participates, directly or through any business entity, in the advertising, promotion, offering for sale, sale, performance or distribution of credit repair service, including participation in the billing or demanding of payment for any credit repair service. The purpose of this fine is to coerce compliance with the Final Order.

IT IS FURTHER ORDERED that Susan Montgomery, who was appointed the Temporary Receiver over CRCA, is hereby appointed Permanent Receiver over CRCA. The Receiver is vested with the full powers of a federal equity receiver, including all of the powers, duties, and rights set forth in the Order Temporarily Freezing Assets of Defendant Murkey and CRCA, Appointing Temporary Receiver over CRCA, Authorizing Immediate Access to CRCA and Expedited Discovery, and Granting Other Provisional Relief, which are incorporated herein by reference. Per request, the Receiver is authorized and directed to (1) return to CRCA's clients all checks and funds received by the Receiver since CRCA was shut down on June 6, 2001; (2) allow Polaris Warner Center to take possession of the leased telephone equipment; (3) move all credit repair/CRCA records out of Suite 300 and permit HQ Global Workplaces to take whatever steps are necessary to lawfully evict Richard Murkey from the premises; (4) sell, through private sales conducted at the CRCA premises, all of the computer equipment, furniture and other personal property located at the CRCA offices; (5) turn over to the FTC for safekeeping all of CRCA's records and other records relating to Murkey's credit repair business, along with the CRCA computer server and one workstation; (6) return the premises to

Transwestern Commercial Services once personal property has been removed. The Receiver shall close, wind down and dissolve CRCA.

## II.

### Sanctions For Violating Prohibition on Specified Representations

A. IT IS FURTHER ORDERED that Defendant Murkey is liable for equitable monetary relief. Defendant Murkey is liable for all funds CRCA or Murkey received after November 10, 1999 from CRCA's sale of credit repair service. The Receiver shall, within two weeks of the date of entry of this Order, review financial records of CRCA, including bank records and computer records, to determine the amount of income CRCA received or generated from the sale of credit repair service between November 11, 1999 and June 6, 2001, and file and serve a report to the Court detailing the Receiver's determination and the basis thereof. Defendant Murkey and Plaintiff shall have five court days to file any objections or response; failure to file any objections within five court days shall be deemed consent to the amount as determined in the Receiver's report. Responses to objections must be filed within five court days. After review of the Receiver's report and all objections and responses, the Court shall enter an order with a final determination as to the amount of restitution that Defendant Murkey shall be required to pay.

B. IT IS FURTHER ORDERED that the Commission may use the funds collected pursuant to Paragraph A of this Section for equitable monetary relief, including, but not limited to, consumer redress and for paying any attendant expenses of administering any redress fund.

C. IT IS FURTHER ORDERED that Defendant Murkey relinquishes any right, title or interest to assets frozen pursuant to this Court's June 5, 2001 Order Temporarily Freezing Assets of Defendant Murkey and CRCA, Appointing Temporary Receiver over CRCA, Authorizing Immediate Access to CRCA and Expedited Discovery, and Granting Other Provisional Relief. Money in all bank, brokerage and other financial accounts shall be transferred directly to the Commission. If the value of the assets so transferred proves to exceed Defendant Murkey's total liability for monetary equitable relief under this Order, the Commission shall return excess funds to Defendant Murkey.

D. IT IS FURTHER ORDERED that Defendant Murkey shall be required to pay to the U.S. Treasury a fine in the amount of $5,000 per day for each day after entry of this Order in which he represents, directly or through any business entity, that he or anyone in active participation or concert with him can substantially improve any or most consumers' credit reports or profiles by effectuating the permanent lawful removal of bankruptcies, liens, judgments, charge-offs, late payments, foreclosures, repossessions, or other negative information from consumers' credit reports, even where such information is accurate and not obsolete.

## III.

### Sanctions For Violating Requirement That Defendants Send Rescission Notices

IT IS FURTHER ORDERED that, if Defendants Murkey or Gill have failed to send notices, within fifteen days after entry of this Order, to all credit repair clients who entered an agreement for credit repair service with either defendant prior to March 4, 1998 and who have not paid the total amount the consumer agreed to pay for the defendants' service, stating that as a result of a court order the contracts are

rescinded and no further payments are due, then each defendant shall be required to pay to the U.S. Treasury a fine in the amount of $1,000 per day until such notices have been sent to all such consumers.

## IV.

### Sanctions for Violating Prohibition on Billing Prior Customers

IT IS FURTHER ORDERED that Defendant Murkey shall be required to pay to the U.S. Treasury a fine in the amount of $5,000 per day for each day after entry of this Order in which he demands payment or enforces or threatens to enforce any contract or agreement for the performance of credit repair service.

## V.

### Sanctions for Violating Requirement of Submitting Compliance Report

IT IS FURTHER ORDERED that, if Defendant Murkey has, by the twentieth business day following entry of this Order, failed to serve on Plaintiff's counsel a written report, sworn to under penalty of perjury, setting forth in detail the manner and form in which he has complied with and is complying with the Final Order and a statement of his current address and telephone number(s), his current employment, his business addresses and telephone numbers, a description of the business activities of each such employer, and his title and responsibilities for each employer, then Defendant Murkey shall be required to pay to the U.S. Treasury a fine in the amount of $1,000 per day until he has served the required report on Plaintiff's counsel.

**IT IS SO ORDERED.**